UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DEADRIAN CORTEZ BOYKINS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:21-cv-00316-JPH-TAB ) |
| SHERI WILSON, MARTIAL KNIESER, DUAN PIERCE, | ) ) ) ) ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

De'Adrian Boykins, an Indiana prisoner, filed this civil rights action alleging that Sheri Wilson, Martial Knieser and Duan Pierce were deliberately indifferent to his serious medical need, namely the administration of insulin to control his diabetes. Defendants have filed a motion for summary judgment. Dkt. [42]. For the reasons below, that motion is **GRANTED**.

**I.
Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the

1

nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II.
## Factual Background

At all times relevant to Mr. Boykins' complaint, he was a convicted prisoner incarcerated at Pendleton Correctional Facility. Dkt. 43 at 6. The Court summarizes each Defendants' involvement in treating Mr. Boykins' Type I diabetes as follows.

### A. Dr. Pierce

During the relevant period, Dr. Pierce was employed by Wexford Health as an Associate Regional Medical Director for the Indiana Department of Correction ("IDOC") who worked onsite with prison medical staff, including those at Pendleton. Dkt. 44-4 at 1 (Pierce Affidavit). During his time in this role, Dr. Pierce had the opportunity to review Mr. Boykins' medical records, and he exchanged email communication with Mr. Boykins' onsite treating providers at Pendleton regarding the management of his Type I diabetes. Dkt. 44-4 at 2. Based on Dr. Pierce's review of Mr. Boykins' records, "throughout the first few months of 2020, [Mr. Boykins] received regular A1C counseling and proper diabetes management and education from his onsite practitioner Sheri Wilson, P.A." *Id.* In his affidavit, Dr. Pierce further noted that beginning on July 28, 2020, Mr. Boykins' medical records show a lapse in compliance, namely his refusal to attend ongoing A1C counseling and blood draws. *Id.*; *see also* dkt. 44-1 at 17 (July 28, 2020 Administrative Note).

In January 2021, onsite medical staff emailed Dr. Pierce about their concerns with Mr. Boykins' treatment plan. *Id.* at 3. On January 11, 2021, an onsite nurse asked Dr. Pierce whether a three-times-daily insulin regimen would

3

be appropriate for Mr. Boykins. *Id.* On January 20, Pendleton's onsite physician Dr. Knieser also emailed Dr. Pierce about Mr. Boykins' request to have insulin provided three times per day. *Id.* Noting Ms. Wilson's reports of Mr. Boykins' multiple missed doses in December 2020 and his overall below-average compliance with his treatment plan, Dr. Pierce advised that Mr. Boykins needed further education regarding proper diet and medication control and that there was no current indication for thrice-daily glucose checks and insulin administration. *Id.*

On April 30, 2021, Dr. Pierce was again contacted to check the status of Mr. Boykins' treatment plan. *Id.* Dr. Pierce conferred with onsite medical staff and learned that Mr. Boykins had multiple refusals of insulin and that there had been reports of his intoxication. *Id.* Dr. Pierce's subsequent review of Mr. Boykins' medical records demonstrated ongoing noncompliance with the ordered insulin regimen, causing episodes of low blood sugar. *Id.* at 4. In considering Mr. Boykins' request for thrice-daily, fast-acting insulin, Dr. Pierce considered Mr. Boykins' ongoing noncompliance with his treating providers, that fast-acting insulin can cause negative consequences if not given immediately before or after a meal, and the potential scheduling disruptions that can arise in a prison setting. *Id.*

In his affidavit, Dr. Pierce attests that the medical treatment, including the insulin regimen, provided to Mr. Boykins was appropriate and based on his "clinical needs and behaviors" and a "discuss[ion] of [his] medical care with other practitioners and leadership to determine the best course of action. *Id.* at 5.

**B. Dr. Knieser**

During all times relevant to Mr. Boykins' claims, Dr. Knieser was the medical director and onsite physician at Pendleton. Dkt. 44-1 at 1 (Knieser Affidavit). Dr. Knieser first met Mr. Boykins on January 20, 2021, after Mr. Boykins was brought to the onsite urgent care clinic exhibiting signs of low blood sugar. *Id.* at 2. Dr. Knieser observed that Mr. Boykins appeared intoxicated and smelled of alcohol. *Id.* Because Mr. Boykins' vitals were otherwise normal, Dr. Knieser allowed him to "sleep it off" in the urgent care clinic before releasing him back to his dorm. *Id.*

On February 10, 2021, Dr. Knieser saw Mr. Boykins for low blood sugar and provided him two tubes of glucose under monitoring. *Id.* Dr. Knieser reviewed his chart and saw that Mr. Boykins had active orders for insulin and did not see any clinical reason to change his treatment plan. *Id.* The next day, Dr. Knieser again saw Mr. Boykins for low blood sugar and again administered glucose under monitoring. *Id.* During this visit, Mr. Boykins reported that he did not eat regularly and missed certain injections, which Dr. Knieser concluded were factors contributing to his episodes of low blood sugar. *Id.* Mr. Boykins showed no signs of acute distress. *Id.* at 2-3.

On April 29, 2021, Dr. Knieser met with Mr. Boykins for a follow-up appointment to discuss his diabetes management. *Id.* at 3. Dr. Knieser advised Mr. Boykins that medical staff was pursuing a possible move for him within the facility so that he could be located closer to the urgent care clinic for quicker response time during any medical episodes. *Id.* Dr. Knieser did not observe that

5

Mr. Boykins was in any acute distress during that visit. *Id.* Dr. Knieser found that Mr. Boykins' diabetes was "very difficult to manage due to his non-compliance with medication and diet." *Id.* Dr. Knieser contacted custody staff about moving Mr. Boykins to the medical ward or infirmary, and he was informed that another inmate would first have to leave the medical ward before Mr. Boykins could be moved there. *Id.* In May 2021, a caseworker asked Dr. Knieser about a possible move, and he advised the caseworker that the determination rests with custody staff. *Id.*

On June 10, 2021, Dr. Knieser met with Mr. Boykins for another chronic care appointment. *Id.* During this visit, Dr. Knieser encouraged him to lose weight to benefit his A1C level, advising him to count calories during his meals and snacks. *Id.* Mr. Boykins was not in any acute distress during the visit. *Id.* Dr. Knieser does not recall providing any further direct treatment to Mr. Boykins, as his medical care was also managed by Defendant Sheri Wilson, P.A. *Id.* at 4. Based on Dr. Knieser's review of Mr. Boykins' medical records, onsite medical providers at Pendleton managed Mr. Boykins' diabetes as clinically indicated based on his low blood sugar levels and overall compliance with his treatment plan, and the medical care that he received met the applicable standards of care. *Id.* at 6.

### C. Ms. Wilson

During all times relevant to Mr. Boykins' complaint, Ms. Wilson was employed by Wexford of Indiana, LLC as a physician's assistant at Pendleton. Dkt. 44-5 at 1 (Wilson Affidavit). During this time, Ms. Wilson saw and treated

6

Mr. Boykins on numerous occasions for his low blood sugar and overall diabetes management. *Id.* at 2-3. The Court summarizes Ms. Wilson's treatment of Mr. Boykins as follows:

- **March 31, 2020:** Ms. Wilson met with Mr. Boykins for a chronic care appointment and noted that his A1C was over 10, which is high and outside of normal limits. *Id.* An average A1C should be below 5.7. *Id.* Mr. Boykins was prescribed two types of insulin: short-acting Humulin R insulin three times daily at Mr. Boykins' mealtimes and long-acting Novolin N insulin twice daily. *Id.* at 2, 5. Mr. Boykins reported skipping his R insulin if his sugar reading was less than 100. *Id.* at 2. Noting that Mr. Boykins' evening sugar readings were consistently over 300, she ordered the Novolin N insulin to be increased in unit dosages and to be withheld if Mr. Boykins' blood sugar read less than 90. *Id.*

- **May 18, 2020:** Ms. Wilson completed a full evaluation during which Mr. Boykins noted no physical complaints and was not exhibiting any concerning symptoms. *Id.* at 2-3. At Mr. Boykins' request, Ms. Wilson did not make any changes to his insulin. *Id.* at 3.

- **June 15, 2020:** Ms. Wilson met with Mr. Boykins and informed him that his A1C had improved to 9.5. *Id.* Mr. Boykins reported compliance with his insulin regimen, and Ms. Wilson provided education and guidance on how to continue controlling his diabetes. *Id.* Based on Mr. Boykins' "reported concerns at that time," Ms. Wilson changed the dosage of his Humulin R to twice per day but made no changes to the order for Novolin N. *Id.*

- **June 29, 2020:** Ms. Wilson ordered Mr. Boykins to continue receiving a diabetic diet at the facility, which included three meals and an evening snack. *Id.*

- **July 28, 2020:** Mr. Boykins refused to meet with Ms. Wilson for scheduled A1C counseling and overall diabetic management review. *Id.* Mr. Boykins also refused a blood draw. *Id.* Ms. Wilson relies on information from blood draws to determine whether any changes are needed to patients' treatment plans. *Id.*

- **October 19, 2020:** Ms. Wilson noted that Mr. Boykins' A1C had improved to 8.5 *Id.* She discussed his medical history and insulin use with him, and he expressed that he understood personal risk factors by having uncontrolled diabetes. *Id.* At this point, Ms. Wilson

considered Mr. Boykins' diabetes "poorly controlled" because his A1C level was still higher than normal limits, albeit improved. *Id.* at 4. Ms. Boykins ordered lab tests for Mr. Boykins, and they discussed medication. *Id.*

- **November 9 and 11, 2020:** Mr. Boykins' appointments on these dates had to be rescheduled due to staffing issues and custody lockdowns. *Id.*

- **December 1, 2020:** Ms. Wilson noted that Mr. Boykins' A1C was 8.4, which was still higher than normal. *Id.* Mr. Boykins reported low blood sugar in the morning, and Ms. Wilson reduced his evening dose of Novolin N insulin from 43 units to 33 units. *Id.* They further discussed his insulin regimen, specifically his refusal of his morning dose of long-acting insulin and his belief that his Humulin R prescription had stopped. *Id.* Ms. Wilson reviewed his record, confirmed that the Humulin R prescription was in place, and advised Mr. Boykins that she would speak to nursing staff. Ms. Wilson also provided education on blood sugar management and adherence to the prescribed insulin schedule. *Id.*

- **January 11, 2021:** In response to an onsite nurse's inquiry about a thrice-daily insulin regimen for Mr. Boykins, Ms. Wilson advised Mr. Boykins that he had missed several doses of his insulin in December 2020, including 15 doses of the N insulin and over 20 doses of the R insulin, and that his A1C was still over 8. *Id.* Ms. Wilson further noted that Mr. Boykins had experienced several low blood sugar episodes since his appointment with her on December 11, 2020, and she reminded Mr. Boykins of the importance of insulin compliance. *Id.*

- **January 29, 2021:** Based on Mr. Boykins' continued reports of low blood sugar, Ms. Wilson decreased his Novolin N to 30 units twice daily and further decreased his Humulin R to 10 units twice daily. *Id.* at 5. She also ordered medical staff to hold the dose of R insulin if his blood sugar tested at less than 100. *Id.*

- **February 10, 2021:** Ms. Wilson discussed Mr. Boykins' low blood sugars with custody staff after Mr. Boykins' mother had called the facility upset about his treatment. *Id.* After the Director of Nursing spoke to custody staff, Ms. Wilson reiterated that Mr. Boykins' insulin regimen was being actively monitored and adjusted. *Id.* She further explained that Mr. Boykins' noncompliance, including his failure to eat regularly and abstain from illicit substances, negatively affected his blood sugar and complicated his issues. *Id.*

8

- **February 26, 2021:** Ms. Wilson received a healthcare request from Mr. Boykins in which he complained of not receiving enough insulin. *Id.* Ms. Wilson reviewed his records, noted his recent compliance with his medication, and adjusted his Humulin R back to three times daily. *Id.* She continued his Novolin N administration two times a day "as this was only ever dosed at twice daily." *Id.*

- **April 28, 2021:** Ms. Wilson responded to another inquiry from custody staff prompted by a phone call from Mr. Boykins' mother. *Id.* at 6. Ms. Wilson explained that medical staff was working to keep Mr. Boykins' diabetes under control, including by adjusting his insulin at his request, despite his noncompliance with their recommendations. *Id.*

- **April 30, 2021:** Ms. Wilson provided a summary of Mr. Boykins' noncompliance for further review by Dr. Pierce. *Id.*

Ms. Wilson does not recall having any further involvement in Mr. Boykins' care during the relevant period. Based on her review of Mr. Boykins' medical records and her recollection of treating Mr. Boykins, his treatment plan and the medical care that he received at Pendleton met the applicable standards of care, and any changes made to his treatment plan were clinically indicated. *Id.* at 7-8. She further attests that any actions she took with respect to Mr. Boykins were based on her "medical training as a licensed practitioner, orders from [his] other onsite treating providers, and [her] professional judgment." *Id.* at 8.

In his deposition, Mr. Boykins testified about his episodes of hypoglycemia and unresponsiveness. Dkt. 44-6 at 6-8. He further testified that he repeatedly expressed to Ms. Wilson that he preferred three doses of the fast-acting Humulin R insulin instead of two doses because "if you stretch it out in three, it will work better because then you won't be given too much within those two doses. And that was the problem." *Id.* at 6.

9

## III.
## Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)); *Arnett v. Webster*, 658 F.3d 742, 750-51 (7th Cir. 2011). "[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible...." *Arnett*, 658 F.3d at 754. Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm." *Id.*

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Defendants do not dispute that Mr. Boykins's Type I diabetes and dependence on insulin is a serious medical need. To survive summary judgment then, Mr. Boykins must show that Defendants acted with deliberate indifference—that is, that they

consciously disregarded a serious risk to his health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

Deliberate indifference requires more than negligence or even objective recklessness. *Id.* "[I]t approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So, in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted). The Seventh Circuit has "held that a jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Id.* at 241-42.

### A. Dr. Pierce

Dr. Pierce is entitled to summary judgment on Mr. Boykin's claim of deliberate indifference. Mr. Boykins argues that Dr. Pierce should have recommended a prescription of thrice-daily, fast-acting insulin. *See* dkt. 48 at 4. But as Associate Regional Medical Director, Dr. Pierce had no direct role in Mr. Boykins' treatment. Dkt. 44-1 at 1. Rather, his involvement in Mr. Boykins' care was limited to reviewing his medical records and exchanging email communication with the onsite medical staff. *Id.* at 2. Dr. Pierce attests that

his recommendations were based on his review of Mr. Boykins' "clinical needs and behaviors" and a "discuss[ion] of [his] medical care with other practitioners and leadership to determine the best course of action." Dkt. 44-4 at 5.

In his response brief, Mr. Boykins argues that Dr. Pierce also considered an unspecified "non-medical" reason for not prescribing thrice-daily insulin. *See* dkt. 48 at 4-5. Although not entirely clear, it appears Mr. Boykins may be referring to Dr. Pierce's concern that administering fast-acting insulin three times a day would increase the risk of hypoglycemia given the often-volatile setting of a prison facility, *see* dkt. 44-4 at 4. But consideration of the safety and practicability of administering a specific type of care in a prison setting does not amount to a constitutional violation. *See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 764 (7th Cir. 2021) (observing that courts may consider the "'competing obligations'" of security and medical concerns when evaluating a medical provider's treatment decisions) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). Mr. Boykins has not designated facts from which a jury could reasonably infer that Dr. Pierce's conclusion regarding Mr. Boykins' request for thrice-daily fast acting insulin was not based on medical judgment. Dr. Pierce is therefore entitled to summary judgment. *Dean*, 18 F.4th at 241.

**B. Dr. Knieser and Ms. Wilson**

Dr. Knieser and Ms. Wilson are likewise entitled to summary judgment. Mr. Boykins also bases his claim against them on his belief that twice-daily insulin administrations were ineffective, so they should have prescribed thrice-

12

daily, fast-acting insulin. *See* dkt. 48 at 8-12. He further contends that Dr. Knieser and Ms. Wilson failed to exercise appropriate professional judgment. *Id.*

As detailed above, Defendants' designated evidence shows that both Dr. Knieser and Ms. Wilson met with Mr. Boykins regularly to treat and manage his diabetes. This included review of his lab results, discussion of his adherence to diet recommendations and insulin administration, and an adjustment of his prescribed medication when clinically indicated. *See* dkt. 44-1 at 1-6, dkt. 44-5 at 1-8. The designated evidence further shows that Dr. Knieser and Ms. Wilson were responsive to changes in Mr. Boykins' condition, lab results, self-reported symptoms, and overall compliance. *See* dkt. 44-1 at 1-6, dkt. 44-5 at 1-8. While Mr. Boykins may disagree with their treatment decisions concerning his insulin prescriptions, that doesn't show deliberate indifference. *Arnett,* 658 F.3d at 754 ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible…."). Accordingly, they are entitled to summary judgment.

## IV.
## Conclusion

For the reasons above, the Defendants' motion for summary judgment is **GRANTED**. Dkt. [42]. Final judgment will issue in a separate entry.

**SO ORDERED.**

Date: 9/15/2023

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

DEADRIAN CORTEZ BOYKINS
201883
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Inmate Mail/Parcels
4490 West Reformatory Road
PENDLETON, IN 46064

All electronically registered counsel.